UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BOBBY KEMP,

                Plaintiff,

        v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

                      <u>DECISION & ORDER</u>

                      12-CV-6666P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Bobby Kemp ("Kemp") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 6).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 14). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Kemp's motion for judgment on the pleadings is denied.

---

[1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

## BACKGROUND

### I.   Procedural Background

Kemp applied for SSI and DIB on May 11, 2009, alleging disability beginning on April 18, 2009, due to a stroke and diabetes.  (Tr. 193, 200, 214).[2]  On May 5, 2011, a hearing to determine Kemp's eligibility for benefits was held before Administrative Law Judge ("ALJ") Scott M. Staller.  (Tr. 43-70).  Kemp was represented by Kelly Laga, Esq., at the hearing.  By decision dated June 10, 2011, the ALJ found that Kemp was not disabled and was not entitled to benefits.  (Tr. 23-35).

On October 25, 2012, the Appeals Council denied Kemp's request for review of the ALJ's decision.  (Tr. 3-8).  Kemp commenced this action on December 5, 2012, seeking review of the Commissioner's decision.  (Docket # 1).  Kemp had previously applied for benefits, which the Commissioner denied by final decision dated April 5, 2002.  (Tr. 210).

### II.   Kemp's Application for Benefits

Kemp was born on January 29, 1965, and is now forty-nine years old.  (Tr. 209). Kemp completed the eleventh grade in 1983 in a regular class setting.[3]  (Tr. 219).  Kemp reported that he has decreased movement on his left side, is unable to lift heavier objects and suffers from back pain.  (Tr. 214).  According to Kemp, he struggles to dress himself because the stroke affected the left side of his body and is no longer able to lift his body weight.  (Tr. 223). Kemp reported that he prepared his own meals approximately two or three times each day, can perform light cleaning including wiping surfaces, light mopping, light vacuuming, watering

---

[2]  The administrative transcript shall be referred to as "Tr. __."

[3]  Although his application for benefits states that he completed eleventh grade, Kemp testified that he completed tenth grade.  (Tr. 48).

plants, light dish washing, and can shop for himself.  (Tr. 225-26).  Kemp reported that he is no longer able to lift weights, play basketball, dance or ride his bicycle.  (Tr. 226).  Kemp also stated that he drags his left leg when he walks, standing aggravates his back and he is unable to reach over his head.  (Tr. 227).  According to Kemp, he experiences pain in his left shoulder and lower back that is aggravated when he walks, sits, bathes, lifts, cleans, stands and sleeps.  (Tr. 229-30).  Kemp takes Tylenol to relieve his pain, but reports that it is ineffective.  (Tr. 230).

Kemp reported that his previous work history included employment as a dishwasher, factory laborer, farm laborer, recess monitor and custodian.  (Tr. 215).  At the time of his applications, Kemp was taking Lisinopril to manage his blood pressure and Metformin and Simvastatin to address his diabetes.  (Tr. 218).  According to Kemp, none of his medications caused any side effects.  (*Id.*).

Kemp updated his application in October 2009.  (Tr. 246-56).  According to Kemp, he no longer prepares his own meals, but relies upon his ex-sister-in-law to prepare his meals because of his instability and shakiness in his left hand.  (Tr. 248).  In addition, Kemp reported that his sister-in-law does most of his shopping, although he still shops approximately once a month.  (Tr. 250).  According to Kemp, he continues to be able to perform light cleaning.  (Tr. 249).  Kemp reported that he continues to experience pain in his back when walking, standing and rising from a seated position.  (Tr. 251).

## III.   Relevant Medical Evidence[4]

### A.   Treatment Records

Treatment notes from F.F. Thompson Hospital ("Thompson") indicate that Kemp suffered a stroke and was admitted to the hospital on April 18, 2009.  (Tr. 317).  Kemp was

---

[4]  Those portions of the treatment records that are relevant to this decision are summarized herein.

discharged five days later.  (Tr. 320).  At discharge, Kemp was diagnosed with right pons stroke with left hemiparesis; diabetes mellitus type 2, new onset; hypertension; hyperlipidemia; and, a possible left tooth abscess.  (*Id.*).  Kemp was prescribed Lisinopril, Metformin, Simvastatin, Glyburide, Aspirin and Penicillin.  (*Id.*).  Kemp was also advised to establish a relationship with a primary care physician to monitor his health.  (Tr. 321).

On April 30, 2009, Kemp attended his first appointment with John Sharza ("Sharza"), MD.  (Tr. 368).  Treatment records reflect that Sharza was Kemp's primary care provider until at least April 21, 2011.  (*See* Ex. 2F at Tr. 350-57, Ex. 3F at Tr. 358-71, Ex. 12F at Tr. 409-13, Ex. 14F at 421-27, Ex. 20F at Tr. 507-08, Ex. 24F at Tr. 529-30, Ex. 30F at Tr. 584-85).  During that time, Sharza monitored Kemp's medical conditions including his high blood pressure, diabetes and weight.  (*See id.*).  Sharza routinely counseled Kemp regarding his diet, exercise routine, efforts at smoking cessation and need to attend physical therapy.  (*See id.*).  On a number of occasions, Kemp complained to Sharza of pain in his shoulder and lower back.  (*See*, *e.g.*, Tr. 365, 411-12, 425).  Sharza referred Kemp to an orthopedist to assess his back pain.  (*See* Ex. 16F at Tr. 495).

Kemp saw an orthopedic physician, Rajeev Patel ("Patel"), MD, on October 18, 2010.  (Tr. 495-98).  After interviewing and examining Kemp, Patel opined that Kemp's symptoms did not suggest radiculopathy or other underlying focal spinal pathology that would be addressed through spine rehabilitation, intervention or surgical options.  (Tr. 497-98).  Patel suggested that Kemp might suffer from a spine alignment or joint displacement condition and directed him to consult with a chiropractor to determine whether chiropractic treatments could address Kemp's back problems.  (*Id.*).  Patel recommended further physical therapy.  (Tr. 497).

4

Treatment notes from Sharza dated January 6, 2011 indicate that Kemp was evaluated by the Spine Center and that the consultant did not believe that Kemp's symptoms were suggestive of a spinal alignment or joint displacement condition.  (Tr. 508).  Sharza referred Kemp to a pain clinic and ultimately to a neurologist.  (Tr. 508, 585).

Treatment notes indicate that Kemp attended approximately six physical therapy sessions after his stroke in April 2009, but discontinued physical therapy because "things came up."  (Tr. 430).  Kemp returned to physical therapy on February 3, 2010.  (*Id.*).  Kemp attended approximately forty-one physical therapy sessions between February 2010 and August 26, 2010.  (Tr. 430-39, 475).  During his physical therapy treatment, Kemp repeatedly reported that he continued to experience severe pain in his back and left leg and that he did not believe that physical therapy provided any improvement.  (Tr. 433-39).  Kemp's physical therapy providers noted that Kemp experienced improved balance and gait through therapy sessions, although his progress was slow, he continued to walk with a limp and his pain appeared to limit his success.  (*Id.*).  Kemp was discharged from physical therapy on November 12, 2010.  (Tr. 500).  According to the discharge notes, Kemp reported that he was sore because he had "tried to do some painting for his landlord."  (*Id.*).  The notes indicate that Kemp had not made any significant progress in physical therapy and that he was discharged from therapy with instructions to consult his primary care physician.  (*Id.*).

Kemp also received treatment at the Canandaigua Eye Center for ocular hypertension.  (Tr. 548-65).  Treatment notes indicate that although Kemp was initially prescribed Xalatan, he did not consistently apply the medication, reportedly failing to apply the eye drops approximately 25% of the time.  (Tr. 553, 557).  Accordingly, Frank C. Lee ("Lee"), MD, recommended that Kemp undergo a selective laser trabeculoplasty ("SLT") in both eyes.

(Tr. 557).  Lee performed the SLT procedure in Kemp's right eye on February 9, 2010 and in his left eye on February 18, 2010.  (Tr. 558-59).  Subsequent treatment notes indicate that Kemp had "an excellent response" to the SLT procedures, which successfully reduced the pressure in Kemp's eyes.  (Tr. 562).

Kemp received treatment from Dr. Shahana Arshad ("Arshad"), an endocrinologist between July 2010 and March 2011.  (Tr. 521-28, 539-43).  Arshad noted that Kemp's blood pressure was "optimal," his left-sided weakness had been "resolved," his blood sugar was "rarely high" and his vision has been "stable."  (Tr. 522-23, 528).

**B.   Medical Assessments**

On August 25, 2009, state examiner Kalyani Ganesh ("Ganesh"), MD, conducted a consultative neurological examination of Kemp.  (Tr. 374-77).  Kemp reported that he suffered a stroke in April 2009 and, despite physical therapy, he continues to experience weakness on the left side of his body and cannot raise his arm all the way.  (Tr. 374).  Kemp used a cane during the examination for his back pain, but reported that the cane was not prescribed by his doctor.  (*Id.*).  Kemp reported that he has diabetes and high blood pressure, but that both are controlled with medication.  (*Id.*).  Kemp stated that his ex-sister-in-law, with whom he lived, performed the household chores.  (Tr. 375).  Kemp reported that he could shower and dress himself.  (*Id.*).  Kemp's activities included watching television, listening to the radio and socializing with friends.  (*Id.*).  At the time of the examination, Kemp was approximately five feet, nine inches tall and weighed 234 pounds.  (*Id.*).  Ganesh noted that Kemp had a limp that favored his left side, his station was normal, he was able to walk on his heels but could not walk on his toes, and his tandem walk heel-to-toe was normal.  (*Id.*).  According to Ganesh, Kemp used the cane as an assistive device, but it did not appear necessary.  (*Id.*).  In addition, Ganesh noted that Kemp did

not need any assistance changing for the exam or getting on or off of the exam table, and was

able to rise from the chair without difficulty.  (*Id.*).  Ganesh further noted that Kemp's hand and

finger dexterity were intact and that his grip strength was 5/5 on his right and 4/5 on his left.  (Tr.

376).

Ganesh noted that Kemp had normal range of motion of the cervical and thoracic

spine.  (*Id.*).  According to Ganesh, Kemp's lumbar spine flexion was 60 degrees, extension 10

degrees, lateral flexion 5 degrees and rotation 5 degrees.  (*Id.*).  Kemp's straight leg raises were

negative bilaterally.  (*Id.*).  Kemp's strength in his upper and lower extremities was 5/5 on his

right side and 4/5 on his left side.  (*Id.*).  Ganesh opined that Kemp had no limitations for sitting

or standing and moderate limitations for walking, climbing, lifting, carrying, pushing and

pulling.  (Tr. 376-77).  In addition, Ganesh opined that Kemp was able to perform simple fine

motor activity.  (*Id.*).

On October 7, 2009, Dr. S. Putcha ("Putcha"), a non-examining state consultant,

completed a Physical Residual Functional Capacity ("RFC") Assessment at the request of the

state disability analyst J. Keidecker.  (Tr. 381-82, 384-89 ).  Putcha opined that Kemp could

occasionally lift twenty pounds and frequently lift ten pounds.  (Tr. 385).  According to Putcha,

Kemp could stand or walk for about six hours during an eight-hour workday and could sit for

about six hours in an eight-hour workday.  (*Id.*).  According to Putcha, Kemp had no limitations

on his ability to push or pull.  (*Id.*).  In addition, Putcha opined that Kemp could occasionally

climb ladders, ropes or scaffolds, balance, stoop, kneel, crouch and crawl.  (Tr. 386).  Putcha also

opined that Kemp was limited in his ability to reach in all directions, including overhead,

because he could not raise his left arm above his head.  (Tr. 385-86).  Putcha opined that Kemp

did not have any further physical limitations.  (Tr. 386-87).  In making the assessment, Putcha

reviewed an x-ray of Kemp's lumbosacral spine, which demonstrated mild degenerative spondylosis at L4-L5 with no compression fractures.  (Tr. 381, 385).

On February 15, 2010, Sharza completed a Diabetes Mellitus RFC Questionnaire. (Tr. 416-19).  On the form, Sharza opined that Kemp frequently (approximately 34-66% of the day) would experience pain or other symptoms interfering with his attention and concentration, but concluded that Kemp would be capable of performing a low stress job.  (Tr. 417).  Sharza opined that Kemp could walk approximately one-quarter mile without a break and could sit for approximately forty-five minutes and stand for approximately five minutes at a time.  (*Id.*). According to Sharza, Kemp could sit for about four hours a day and could stand or walk for less than two hours a day.  (*Id.*).  Sharza opined that Kemp would need a job that would permit him to shift from sitting to standing at will.  (*Id.*).  According to Sharza, Kemp would need to take unscheduled breaks of five to ten minutes approximately two to three times each day.  (Tr. 418).

In addition, Sharza opined that Kemp could frequently lift ten pounds, could rarely lift twenty pounds and could never lift fifty pounds.  (*Id.*).  Further, Kemp could only rarely squat, crouch or climb stairs and could never twist, stoop or climb ladders.  (*Id.*).  Sharza also opined that Kemp could not reach overhead with his left arm and had limitations in his ability to perform handling and fingering tasks.  (*Id.*).  Finally, Sharza opined that Kemp would likely be absent from work more than four days per month as a result of his impairments.  (Tr. 419).

IV.  **Proceedings before the ALJ**

At the administrative hearing, Kemp testified that he completed school through the tenth grade and that he had previous employment as line cook, dishwasher, building

maintenance employee, farm laborer and chicken cook.  (Tr. 48-51).  According to Kemp, he has

not worked since January 2009, when he was laid off.  (Tr. 52).

Kemp testified that his stroke caused weakness on the left side of his body and

that he experiences back, leg and shoulder pain.  (*Id.*).  In addition, Kemp testified that he

experiences shaking in his left hand when gripping objects.  (Tr. 52-53).  According to Kemp, he

has difficulty sleeping and only sleeps one to two hours per night.  (Tr. 57).  Kemp testified that

he watches television, walks to the library once a day, cooks simple meals, and goes grocery

shopping with his sister.  (Tr. 54).  According to Kemp, the library is approximately one-quarter

mile from home, and he must climb approximately 18 steps to reach his apartment.  (Tr. 59).

Kemp testified that he takes breaks to rest during his walks to the library.  (*Id.*).  According to

Kemp, his sister helps him with his household chores, including washing the dishes, vacuuming

and laundry.  (Tr. 54, 58).  Kemp testified that he underwent laser surgery on his eye, but

continues to experience fluid in his eyes.  (Tr. 62).

A vocational expert, Mary Beth Kopar ("Kopar"), also testified during the

hearing.  (Tr. 65-69).  The ALJ first asked Kopar to characterize Kemp's previous employment.

(Tr. 65-66).  According to Kopar, Kemp had previously been employed as a kitchen helper, farm

laborer, landscape laborer, building repairer, fry cook and store laborer.  (Tr. 66).

The ALJ then asked Kopar whether a person of the same age as Kemp, with the

same education and vocational profile, who was able to perform light work, but could only

occasionally climb, balance, stoop, kneel, crouch, or crawl, occasionally reach, handle and finger

with their left, non-dominant extremity and who must avoid exposure to dangerous moving

machinery and unprotected heights, would be able to perform any of the work that Kemp

previously performed.  (*Id.*).  Kopar opined that such an individual would be unable to perform

the previously-identified positions, but would be able to perform jobs available in the local and

national economy, including sorter, DOT number 222.687-014 with over 300,000 positions in

the national economy and 2,000 positions in New York State; host, DOT number 349.667-014,

with over 250,000 positions in the national economy and 8,000 in New York State; and ticket

seller, DOT number 211.467-030, with over 1,000,000 positions in the national economy and

50,000 in New York State.  (Tr. 66-67).

   The ALJ then asked Kopar whether work would be available for a person with the

same limitations including an added limitation of being able to perform only sedentary work.

(Tr. 67).  Kopar testified that such an individual could perform jobs available in the local and

national economy, including ticket checker, addresser and surveillance systems monitor.  (*Id.*).

Kopar also testified that these jobs would not be available if that individual was off-task

approximately twenty percent of the time or missed two or more days of work per month.  (Tr.

67-68).  Kopar testified that if the individual needed a sit/stand option, he would still be able to

perform the positions of ticket seller, addresser and surveillance systems monitor.  (Tr. 68).  In

addition, Kopar testified that if the same individual was limited to occasional reaching, handling

and fingering in both hands, the individual could not perform the position of addresser or ticket

seller, but could perform the position of surveillance systems monitor.  (*Id.*).

## DISCUSSION

### I. Standard of Review

   This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

    To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § § 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five-steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. § § 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.    **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 23-35).  Under step one of the process, the ALJ found that Kemp had not engaged in substantial gainful activity since April 18, 2009, the alleged onset date.  (Tr. 28).  At step two, the ALJ concluded that Kemp has the severe impairments of residual effects of a cerebrovascular accident with left-sided weakness, diabetes mellitus, degenerative disc disease of the lumbar spine, hypertension and obesity.  (*Id.*).  The ALJ determined that Kemp's hyperlipidemia was not severe.  (*Id.*).  At step three, the ALJ determined that Kemp does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 29).  The ALJ concluded that Kemp had the RFC to perform light work, except that he could only occasionally climb, balance, stoop, kneel, crouch or crawl, occasionally handle, finger and reach, including overhead, with his left, non-dominant, upper extremity, and must avoid exposure to operational control of moving machinery and unprotected heights.  (*Id.*).  At step four, the ALJ determined that Kemp was unable to perform his former work.  (Tr. 33).  Finally, at step five, the ALJ concluded that Kemp could perform other jobs that existed in the local and national economy, including sorter, host and ticket seller.  (Tr. 34).  Accordingly, the ALJ found that Kemp is not disabled.  (*Id.*).

B.    **Kemp's Contentions**

Kemp contends that the ALJ's determination that he is not disabled is not supported by substantial evidence.  (Docket # 14-1).  First, Kemp contends that the ALJ erred by failing to acknowledge or discuss Kemp's ocular hypertension at step two.  (*Id.* at 6-8).  Next, Kemp contends that the ALJ failed to discuss or assess Kemp's complaints of pain when conducting his credibility assessment.  (*Id.* at 8-10).  In addition, Kemp maintains that the ALJ's

finding at step five that sufficient jobs existed in the economy which Kemp can perform is not

supported by substantial evidence because the vocational expert failed to provide estimates of the

number of positions available in the regional economy.  (*Id.* at 10-14).  Finally, Kemp maintains

that the ALJ improperly applied the treating physician rule when he determined to give Sharza's

medical assessment limited weight.  (*Id.* at 14-17).


II.     **Analysis**

A.     **Severity Assessment**

At step two of the evaluation, the ALJ must determine whether the claimant has a

"severe impairment" that "significantly limits [the claimant's] physical or mental ability to do

basic work activities."  20 C.F.R. 404.1520 (a)(4)(ii), (c).  "An impairment or combination of

impairments is 'not severe' when medical and other evidence establishes only a slight

abnormality or a combination of slight abnormalities that would have at most a minimal effect on

an individual's ability to perform basic work activities."  *Jeffords v. Astrue*, 2012 WL 3860800,

*3 (W.D.N.Y. 2012) (quoting *Ahern v. Astrue*, 2011 WL 1113534, *8 (E.D.N.Y. 2011)); *see also*

*Schifano v. Astrue*, 2013 WL 2898058, *3 (W.D.N.Y. 2013) ("[a]n impairment is severe if it

causes more than a *de minimus* limitation to a claimant's physical or mental ability to do basic

work activities").

Even assuming that Kemp's ocular hypertension constituted a severe impairment,

I find that any error in failing to find the impairment severe was harmless.  As a general matter,

an error in an "ALJ's severity assessment with regard to a given impairment is harmless . . .

'when it is clear that the ALJ considered the claimant's [impairments] and their effect on his or

her ability to work during the balance of the sequential evaluation process.'"  *Graves v. Astrue*,

2012 WL 4754740, *9 (W.D.N.Y. 2012) (alteration in original) (quoting *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 154 (N.D.N.Y. 2012)).

As an initial matter, Kemp believes that the ALJ misunderstood his testimony that he underwent an SLT procedure; as proof of the purported misunderstanding, he notes that the ALJ asked Kemp when his "Lasik" procedure was performed.  (Docket # 14-1 at 6).  A review of the transcript, however, demonstrates that the question was posed by Kemp's attorney, not the ALJ.  (Tr. 62).

In any event, I conclude that the ALJ specifically considered Kemp's ocular hypertension in his analysis.  The ALJ noted that Kemp was treated for ocular hypertension in 2010 and that Kemp had been non-compliant with treatment.  (Tr. 31).  Although the ALJ did not explicitly refer to the two SLT procedures, the ALJ did note that treatment notes from January 2011 reported that Kemp's vision was stable.  (*Id.*).  That observation is consistent with the treatment notes from Lee, the physician who performed the SLT procedures, indicating that the procedures successfully reduced the pressure in Kemp's eyes.  Accordingly, I find that "any error in step two's severity determination was harmless."  *Graves v. Astrue*, 2012 WL 4754740 at *9 (nonsevere finding at step two harmless where the ALJ "considered [claimant's] learning disability and its effect on her ability to work during the balance of the sequential evaluation process"); *see also Schifano v. Astrue*, 2013 WL 2898058 at *3 ("[w]here a finding of a severe impairment is improperly omitted, the error may be deemed harmless where the disability analysis continues and the ALJ considers the omitted impairment in the RFC determination") (citing *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013)).

B.      **ALJ's Pain Assessment**

I turn next to Kemp's contention that the ALJ overlooked information or otherwise failed to properly assess Kemp's credibility concerning his subjective complaints of pain.  (Docket # 14-1 at 8-10).  A claimant's statements of pain or other limitations are not sufficient alone to establish a medically determinable impairment; instead, such impairments must be established through medically acceptable clinical or laboratory diagnostic techniques demonstrating the existence of a medical impairment.  *Skiver v. Colvin*, 2014 WL 800228, *6 (W.D.N.Y. 2014).  Once the claimant has established a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ "'must then evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work."  *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (quoting 20 C.F.R. §  416.929(c)(1)).  When the claimant alleges "symptoms of greater severity than can be established by the objective medical findings, the ALJ will consider other evidence, including factors such as the daily activities; the nature, extent and duration of symptoms; and the treatment provided."  *See Skiver v. Colvin*, 2014 WL 800228 at *6 (citing 20 C.F.R. §  416.929(c)(3)).  When conducting his evaluation, the Commissioner's role is "to resolve evidentiary conflicts and to appraise the credibility of witnesses."  *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983).

In the instant case, after finding that Kemp's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the ALJ found that Kemp's statements concerning the intensity, persistence, and limiting effects of his symptoms were not wholly credible.  (Tr. 30).  With respect to the residual effects from Kemp's stroke, the ALJ determined that the limitations were not as severe as Kemp alleged.  To support this

determination, the ALJ referred to medical records demonstrating that immediately after his stroke Kemp attended only six physical therapy appointments before discontinuing treatment. In addition, the ALJ relied upon the results of the consultative neurological examination performed by Ganesh, who opined that Kemp's sensory responses were normal, that Kemp was able to walk on his heels and tandem walk heel-to-toe, and that Kemp's Romberg test was negative. Further, the ALJ noted that Kemp returned to physical therapy in February 2010 and at that time was assessed to be a good candidate for vocational rehabilitation. Finally, the ALJ noted that Arshad's treatment notes suggested that Kemp's left-sided weakness had been resolved.

The ALJ also considered Kemp's testimony and statements concerning the effects of his stroke on his body, including symptoms of weakness, pain and shakiness in his left hand. (*Id.*). The ALJ concluded that the severity of the symptoms alleged by Kemp were inconsistent with his reported activities of daily living, such as his ability to cook simple meals, dress himself, perform light cleaning, walk, shop and do light exercises.[5]

Similarly, with respect to Kemp's allegations of debilitating back pain, the ALJ concluded that Kemp's limitations were not as severe as he claimed. The ALJ reviewed the objective medical evidence, including x-rays that demonstrated mild degeneration, and the opinions of Patel and the Spine Center consultant who both concluded that Kemp's symptoms were not "spinal in etiology" or suggestive of spinal alignment and joint displacement. (Tr. 31). The ALJ cited records from Kemp's physical therapy sessions and noted that Kemp complained

---

[5] Kemp's statements concerning his activities of daily living were slightly varied between his application and his hearing testimony. In his original application, Kemp stated that he could perform light cleaning, prepare his own meals and shop for groceries. (Tr. 225-26). Kemp supplemented his application and indicated that although he continued to be able to perform light cleaning activities, his sister-in-law prepared his meals and conducted most of the shopping. (Tr. 248-50). During the hearing, Kemp testified that his sister assisted him with household chores, meal preparation, and grocery shopping, although Kemp was able to prepare simple meals and accompanied his sister to the store. (Tr. 54, 58).

of "severe pain" across his low back.  In addition, the ALJ considered Kemp's reported activities including painting for his landlord.

Kemp contends that the ALJ's assessment of his credibility was flawed because the ALJ overlooked the fact that Kemp returned to physical therapy in 2010 and attended approximately thirty-seven sessions.  During those sessions, Kemp frequently complained of ongoing back pain.  While Kemp is correct that the ALJ did not quote at length from Kemp's physical therapy treatment records, I disagree that this failure suggests that the ALJ overlooked the records or otherwise warrants remand.[6]  The ALJ specifically cited Kemp's physical therapy treatment records in assessing limitations caused both by Kemp's stroke and his degenerative disc disease.  In doing so, he explicitly acknowledged that Kemp returned to physical therapy in 2010 and that Kemp complained of severe pain in his back.  Thus, the record demonstrates that the ALJ considered Kemp's return to physical therapy and Kemp's statements of back pain when conducting his assessment; his failure to discuss the records in more detail does not warrant remand.  *See Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) ("'[a]n ALJ does not have to state on the record every reason justifying a decision,' nor is an ALJ 'required to discuss every piece of evidence submitted'") (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)).

**C.**      **Application of Treating Physician Rule**

Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R.

---

[6]  Kemp contends that the ALJ's citation of only four pages of the sixty-five page exhibit suggests that the ALJ did not properly consider the physical therapy treatment records.  The Court notes that the first two pages of the exhibit do not contain any relevant information and twelve pages contain a summary of the information contained in the records.  (*Compare* Tr. 430-39, 475, 477 *with* 440-92).  Thus, the ALJ cited to at least four of the twelve pages of summary information.

§ 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010)

("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is

consistent with the other substantial evidence").  Thus, "[t]he opinion of a treating physician is

generally given greater weight than that of a consulting physician, because the treating physician

has observed the patient over a longer period of time and is able to give a more detailed picture

of the claimant's medical history."  *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y.

2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a

treating physician must consider various 'factors' to determine how much weight to give to the

opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must explicitly

consider:

(1)  the frequency of examination and length, nature, and extent
     of the treatment relationship,

(2)  the evidence in support of the physician's opinion,

(3)  the consistency of the opinion with the record as a whole,

(4)  whether the opinion is from a specialist, and

(5)  whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199.  The regulations also direct that the ALJ

should "give good reasons in [his] notice of determination or decision for the weight [he] give[s]

[claimant's] treating source's opinion."  *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R.

§ 404.1527(c)(2)).  "Even if the above-listed factors have not established that the treating

physician's opinion should be given controlling weight, it is still entitled to deference, and

should not be disregarded."  *Salisbury v. Astrue*, 2008 WL 5110992 at *4.  The same factors

should be used to determine the weight to give to a consultative physician's opinion.  *Tomasello*

*v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011).  "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician."  *See id.*

      As an initial matter, I reject any contention that a remand is required because the ALJ failed to explicitly refer to each of regulatory factors when he determined the amount of weight to afford to Sharza's opinions.  *See Molina v. Colvin*, 2014 WL 3925303, *2 (S.D.N.Y. 2014) (remand not appropriate where ALJ failed to explicitly refer to each of the six statutory factors) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("rejecting challenge to ALJ's 'failure to review explicitly each factor provided in 20 C.F.R. 404.1527(c)(2)' because the Second Circuit 'requires no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear'").  In his decision, the ALJ recounted the factors applicable to the treating physician analysis, and his determination reflects a thorough review of the record, including multiple references to Sharza's treatment notes.  Accordingly, although the ALJ might not have discussed each of the factors, the decision as a whole supports the conclusion that the ALJ "conscientiously applied the substance of the treating physician rule."  *See id.* (internal quotation omitted); *see also Scitney v. Colvin*, 2014 WL 4058975, *12 (W.D.N.Y. 2014) ("an ALJ does not have to explicitly walk through each of these factors, so long as the Court can 'conclude that the ALJ applied the substance of the treating physician rule . . . and provide[d] 'good reasons' for the weight she gives to the treating source's opinion'") (quoting *Halloran*, 362 F.3d at 32).

      I also conclude that the ALJ provided "good reasons" for his decision to give "limited weight" to Sharza's opinion that Kemp could only sit for about four hours and stand for

less than two hours in a normal workday and that Kemp would miss more than four days of work each month due to his impairments.  (Tr. 32).  In his decision, the ALJ discounted these opinions on the grounds that they were inconsistent with other substantial evidence in the record.  The ALJ noted that nothing in the record supported a conclusion that Kemp's diabetes would cause sitting or standing limitations or would cause Kemp to be absent four times per month.  (*Id.*).  I agree.

Similarly, to the extent that Sharza relied upon Kemp's complaints of back pain or his left-sided weakness when assessing the limitations, the ALJ concluded that the record did not support limitations to the degree assessed by Sharza.  In discounting Sharza's opinions, the ALJ noted that the x-ray of Kemp's spine revealed only mild degenerative spondylosis and that treatment records suggested that Kemp's left-sided weakness had resolved.  In addition, the ALJ noted that the limitations described by Sharza were inconsistent with Kemp's reported activities, which included painting for his landlord.  (Tr. 33).  In his decision, the ALJ discussed the objective evidence relating to Kemp's back pain, including the treatment notes from Patel, who opined that Kemp's back problems did not stem from any problems in his spine because his x-rays were normal.  (Tr. 31).  In addition, the ALJ noted that the consultant from the Spine Center opined that Kemp's back problems were not suggestive of spinal alignment or joint displacement conditions.  (*Id.*).

Substantial evidence in the record conflicts with Sharza's opinions regarding Kemp's sitting and standing limitations and his need to be absent from work.  First, Kemp's reported activities of daily living indicate that he walks to the library every day – a round trip of approximately one half-mile – and that he is able to perform basic activities of daily living, such as personal hygiene, preparation of simple meals, light cleaning and shopping.  Finally, Sharza's

opinions are incompatible with the opinions of the state examining and non-examining

physicians.  Ganesh opined that Kemp had no limitation in his ability to sit or stand, and Putcha

opined that Kemp was capable of sitting and standing for about six hours in an eight-hour

workday and thus capable of performing light work.  (Tr. 376, 382, 385).

   Accordingly, I conclude that the ALJ did not violate the treating physician rule by

determining that he was affording "limited weight" to certain opinions of Sharza for the reasons

he explained.  *See Scitney v. Colvin*, 2014 WL 4058975 at *11-12 (ALJ properly discounted

opinion of treating physician where the opinion was inconsistent with the record as a whole,

including the opinions of state consultative physicians and claimant's testimony of daily

activities); *Molina v. Colvin*, 2014 WL 3925303 at *2 (ALJ did not err in declining to credit

opinion of treating physician where the "opinion was contradicted by 'other substantial evidence

in the record,' including two other doctors' opinions"); *Atwater v. Astrue*, 2012 WL 28265, *4-5

(W.D.N.Y. 2012) (ALJ properly found treating physician's opinion inconsistent with record as a

whole where opinion conflicted with opinions of state agency medical consultants and was

inconsistent with claimant's reported activities), *aff'd*, 512 F. App'x 67 (2d Cir. 2013).

  **D.**  **<u>Step Five Assessment</u>**

   I turn last to Kemp's challenge to the ALJ's step five determination.  The only

challenge that Kemp raises to the ALJ's determination at step five is that the vocational expert

testified that jobs existed in the national economy and in New York, but did not provide any

testimony concerning the number of jobs available in the "region," including the "western

counties of New York."  (Docket # 14-1 at 10-14).  Ample authority refutes Kemp's contention

that remand is required for this purported failure.  *See*, *e.g.*, *Updike v. Colvin*, 2014 WL 2435613,

*11-12 (W.D.N.Y. 2014) (rejecting claimant's challenge to ALJ's step five determination on the

grounds that vocational expert provided only national and statewide numbers; "a claimant's inability to obtain such work, the unavailability of work in the claimant's local area, or the unavailability of job openings, among others, do not constitute grounds for a disability finding") (internal quotation omitted); *Kemp v. Comm'r of Soc. Sec.*, 2011 WL 3876526, *13 (N.D.N.Y.) (ALJ properly relied upon number of jobs in national economy at step five where vocational expert provided testimony concerning number of jobs in national economy and state of Connecticut where claimant originally filed claim, despite absence of testimony concerning the number of jobs in New York state where claimant had moved), *report and recommendation adopted*, 2011 WL 3876419 (N.D.N.Y. 2011); *Colon v. Comm'r of Soc. Sec.*, 2004 WL 1144059, *8 (N.D.N.Y. 2004) (rejecting claimant's contention that remand was warranted because vocational expert's testimony established significant number of jobs in national economy, but failed to establish significant jobs in regional economy; "[a]lthough [claimant] argues that those jobs are unavailable in the regional economy, the truth of that assertion is irrelevant because it fails to consider the proper legal standard").

## **CONCLUSION**

This Court finds that the Commissioner's denial of DIB and SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 8)** is **GRANTED**. Kemp's motion for judgment on the pleadings **(Docket**

**# 14)** is **DENIED**, and Kemp's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

*s/Marian W. Payson*

_____

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        September 24, 2014